MICHAEL A. BRYANT, Employee, Plaintiff,
v.
NEWCON, INC., Employer, and STONEWOOD INSURANCE COMPANY, Carrier; and
STROBER ORGANIZATION, INC., Employer, and AMERICAN CASUALTY OF READING, PA, Carrier; and
GREENLEAF NURSERY, INC., Employer, and ARGONAUT MIDWEST INSURANCE COMPANY, Carrier, Defendants.
No. COA08-1477
Court of Appeals of North Carolina
Filed September 15, 2009
This case not for publication
Braxton H. Bell for Plaintiff.
Brooks, Stevens & Pope, P.A., by Matthew P. Blake and Christie Bynum, for Defendant Newcon, Inc. and Stonewood Insurance Company.
Cranfill Sumner & Hartzog LLP, by Jaye E. Bingham and Leanne E. Livengood, for Defendant Strober Organization, Inc. and American Casualty of Reading, PA.
McAngus, Goudelock & Courie, P.L.L.C., by Kara L. Sharrard, for Defendant Greenleaf Nursery, Inc. and Argonaut Midwest Insurance Company.
STEPHENS, Judge.

I. Procedural History
In connection with alleged head and back injuries sustained 9 December 2004 while employed with Strober Organization, Inc. ("Strober"),[1] an alleged back injury sustained on 1 April 2005 while employed with Greenleaf Nursery Company, Inc. ("Greenleaf"), and an alleged back injury sustained on 7 September 2005 while employed with Newcon, Inc. ("Newcon"), Michael A. Bryant ("Plaintiff") filed worker's compensation claims against Strober, Greenleaf, and Newcon (collectively, "Defendants") between January 2005 and September 2005. On 8 November 2006, the claims were consolidated and the matter was heard on 14 February 2007 by Deputy Commissioner Wanda Blanche Taylor.
On 19 December 2007, Deputy Commissioner Taylor filed an Opinion and Award denying further medical and indemnity benefits to Plaintiff for the 9 December 2004 and 1 April 2005 injuries, and dismissing Plaintiff's 7 September 2005 injury claim.
Plaintiff appealed from the Deputy Commissioner's Opinion and Award, and the matter was reviewed by the Full Commission on 26 June 2008. On 29 July 2008, the Full Commission filed an Opinion and Award adopting with modifications Deputy Commissioner Taylor's Opinion and Award. From the Full Commission's Opinion and Award, Plaintiff appeals. For the reasons stated herein, we affirm.

II. Evidence
On 9 December 2004, while loading drywall through a second floor window at Strober's work site, Plaintiff fell approximately 12 feet to the first floor, losing consciousness. Plaintiff was taken by ambulance to the Central Carolina Hospital. Although Plaintiff was conscious in the ambulance and emergency room, Plaintiff was kept in the hospital for observation. CT scans of his head, abdomen, pelvis, chest, and cervical spine revealed soft tissue swelling in the abdomen and chest, but no evidence of intraperitoneal, intrathoracic, or intracranial injuries. Plaintiff was diagnosed with, inter alia, a closed head injury and a spinal injury. Plaintiff was released to work without restrictions on 10 January 2005.
Plaintiff returned to work on 10 January 2005, but sought treatment at the Rapid Response Urgent Care on 11 January 2005 for lower back pain. Plaintiff reported that he had been lifting sheetrock when he experienced lower back pain. Plaintiff was diagnosed with a right paraspinous muscle strain and lumbosacral strain with sciatica. He was placed on light-duty work with certain restrictions.
Plaintiff returned to Rapid Response for a scheduled follow-up visit on 18 January 2005. Plaintiff complained of continuing lower back pain, a blurry left eye, and memory/cognition problems. Plaintiff was diagnosed with a lumbosacral strain and post-concussion syndrome. Plaintiff was referred for a neurological evaluation and physical therapy. Light-duty work with the same restrictions was continued.
Plaintiff returned to Rapid Response for a scheduled follow-up visit on 26 January 2005. He had not yet seen a neurologist. Plaintiff had "multiple complaints[,]" including right leg numbness and dizziness. Plaintiff was released to full-duty work with no restrictions.
On 1 February 2005, Plaintiff returned to Rapid Response complaining of lower back pain. Plaintiff reported that he had bent down at the waist to pick up an object when he felt a sudden onset of lower back pain with a sharp pain down his right leg. Following an examination, he was released to modified-duty work with certain restrictions.
Plaintiff returned to Rapid Response for a scheduled follow-up visit on 8 February 2005. He reported worse lower back pain in addition to numerous other complaints. Plaintiff was advised that Rapid Response could only address the lower back pain and that the other complaints would be referred to another physician. Plaintiff was returned to full-duty work.
Plaintiff was terminated from his employment with Strober on 8 February 2005 because he did not return to work and did not contact the employer. Plaintiff was notified of his termination via certified letter after the employer was not able to contact Plaintiff for 48 hours.
On 9 March 2005, Plaintiff began working for Greenleaf. Plaintiff's job duties included pruning trees, loading trucks, shipping and receiving work, moving objects, and shearing bushes, shrubs, and trees.
On 23 March 2005, Plaintiff saw Dr. Michael Kushner, a neurologist with Wilson Orthopaedic Surgery and Neurology Center. Plaintiff reported the following: On 1 November 2004, he was working on a construction site pulling sheetrock when he fell about 13 feet, struck his head, and was rendered unconscious for at least half an hour. In his deposition, Dr. Kushner noted that the records from Central Carolina Hospital were dated 9 December 2004, not 1 November 2004, and that a CT scan of Plaintiff's head was normal. Dr. Kushner recommended a brain MRI and an electroencephalogram ("EEG"). Although Dr. Kushner did not confirm Plaintiff's assertion that he had been unconscious for half an hour after the fall, Dr. Kushner concluded that "[h]istory supports a diagnosis of traumatic brain injury syndrome. Additionally, soft tissue syndrome and possible root or peripheral nerve injury must be considered." The results of Plaintiff's EEG were normal, as were the results of vision testing.
On 1 April 2005, Plaintiff sought treatment for lower back pain from the Heritage Hospital emergency room. Plaintiff reported that he had been having intermittent back problems for a long time and that on that day, he lifted two bags of heavy sand and immediately felt pain in his lower back which radiated down his right leg. Patient was diagnosed with a back strain and written out of work from 1 April through 4 April 2005.
On 7 April 2005, Plaintiff underwent an MRI of his brain. The results were normal. Plaintiff returned to Dr. Kushner for a scheduled follow-up visit on 13 April 2005. Dr. Kushner noted that he and Plaintiff "talked for quite a long time." Plaintiff reported three main complaints, including lower back pain with leg pain and spasms across his chest. Plaintiff's wife reported to Dr. Kushner that she was "very worried about her husband's mental status." Dr. Kushner's impression was that Plaintiff was suffering from traumatic brain injury syndrome and soft tissue syndrome.
On 8 April 2005, Plaintiff had an orthopaedic spine consultation at Carolina Regional Orthopaedics. Plaintiff was seen by physician's assistant Guy A. Mazzone. Mr. Mazzone noted that Plaintiff sustained a work-related injury to his lower back on 1 April 2005 as a result of lifting bags of sand. Plaintiff was diagnosed with a lumbosacral strain and a right lumbar radiculopathy, given medication, and ordered to engage in physical therapy.
On 19 April 2005, Plaintiff returned to Mr. Mazzone for a scheduled follow-up visit. He was ordered to continue with his medication and to complete physical therapy. He was written out of work until he completed physical therapy.
On 2 May 2005, Plaintiff again returned to Mr. Mazzone for a scheduled visit. Plaintiff continued to be kept out of work and an MRI of his lower back was ordered. The MRI, completed on 14 May 2005, showed underlying L5 nerve root compression. Plaintiff saw Dr. David Charles Miller of Carolina Regional Orthopaedics on 20 May 2005. Dr. Miller noted that Plaintiff had continued back and right-sided symptoms related to his work injury of 1 April 2005. Plaintiff was returned to light-duty work with certain restrictions.
Plaintiff saw Mr. Mazzone again on 17 June 2005. He was continued on light-duty work. On 15 July 2005, Dr. Miller released Plaintiff for a trial of normal work, noting that he hoped Plaintiff's final visit would be in four weeks.
Plaintiff testified that he was not able to do his regular work at Greenleaf, although he could do light-duty work consisting of picking up leaves, raking leaves, and sweeping. Plaintiff voluntarily resigned from his job with Greenleaf and moved to Rocky Mount.
On 25 July 2005, Plaintiff began working as a construction laborer with Newcon. Plaintiff did not inform anyone at Newcon about his back problems, even though the job required heavy lifting. On 7 September 2005, Plaintiff told Ricky New, one of the three partners of Newcon, that he had hurt his back on the job. Plaintiff initially told Mr. New that he had injured his back while "knocking pins." Later in the day, Plaintiff told Mr. New that he had hurt his back setting up an end board. Plaintiff subsequently told Mr. New that he had injured his back attempting to load a form into the truck by himself. Mr. New documented these differing accounts in his records on that day.
Mr. New took Plaintiff to the emergency room at Nash Urgent Care following Plaintiff's alleged injury. Mr. New testified that Plaintiff never indicated that he was in any pain when they were on the way to the emergency room. Plaintiff was written out of work on 8 September 2005 and ordered to remain on light-duty work from 9 September through 14 September 2005. Plaintiff returned to light-duty work on 9 September 2005. Plaintiff was terminated from Newcon on 12 September 2005 after Plaintiff falsely reported that he had completed a task. Plaintiff has not looked for work since being terminated from Newcon.
On 15 September 2005, Plaintiff saw Dr. Miller. Plaintiff complained of pain in his lower back which radiated down both legs. Dr. Miller wrote Plaintiff out of work. Plaintiff was treated by Mr. Mazzone on 10 October 2005. Plaintiff reported no change in his symptoms. He was again written out of work. On 6 December 2005, Plaintiff was seen by Thomas J. Galisin, a physician's assistant at Carolina Regional Orthopaedics. Plaintiff received an epidural injection of cortisone. Mr. Galisin advised Plaintiff that if he did not experience any relief from the injection, he might want to consider surgical intervention.
On 20 December 2005, Plaintiff underwent a psychological evaluation at the North Carolina Department of Health and Human Services by Dr. Daniel E. Everhart. Plaintiff "perform[ed] within the impaired range across the various index scores of the Third Edition of the Wechsler Memory Scale." Dr. Everhart noted that Plaintiff's presentation was in sharp contrast with his testing scores, and that his "uncharacteristic performance" may be attributable to several factors including: (1) his limited pre-morbid cognitive function; (2) the possibility that Plaintiff did suffer a closed head injury that impacted his cognitive function; and (3) the possibility that Plaintiff "is exaggerating his symptoms." Dr. Everhart stated that "[m]ore in-depth testing with tests that are sensitive to motivation and effort may be helpful." Dr. Everhart then opined, "I doubt [Plaintiff] could tolerate the stress and pressures associated with full-time work activity. Again, however, this is qualified by the fact that I am uncertain to what extent the patient was motivated for testing on this date."
Plaintiff was seen by Dr. Miller on 5 January 2006, and reported that although the epidural injection had provided temporary relief, his pain had returned. Dr. Miller advised Plaintiff that surgery was the only treatment option. On 25 May 2006, Dr. Miller reported that Plaintiff underwent an MRI on his back on 20 May 2006. Based on the results of the MRI, Dr. Miller again recommended surgery. In a letter to Plaintiff dated 12 June 2006, Dr. Miller noted that Plaintiff had cancelled surgery twice and explained that there were no treatment options available for Plaintiff's back condition other than surgery. In light of the fact that Plaintiff had cancelled his surgery, Dr. Miller discharged Plaintiff from his care.
Marta Fitzpatrick, a worker's compensation claims adjuster for Stonewood, was assigned to investigate Plaintiff's alleged injury of 7 September 2005 while he was working for Newcon. When she first interviewed Plaintiff on 26 September 2005, she asked him if he had any prior workers' compensation claims or any previous problems with his back. Plaintiff denied having any past claims or injuries. However, an ISO claims search revealed that Plaintiff had filed multiple workers' compensation claims, including claims for the 9 December 2004 back injury with Strober, an alleged 11 January 2005 lower back strain with Strober, and the 1 April 2005 back injury with Greenleaf. After Ms. Fitzpatrick confronted Plaintiff with this information, Plaintiff admitted making the prior claims.
Ms. Fitzpatrick assigned Martin Baier, a private investigator, to conduct surveillance on Plaintiff. Mr. Baier conducted surveillance of Plaintiff on six different days, recording Plaintiff's activities on video during this time. Mr. Baier also prepared three reports of what he observed while watching Plaintiff. Mr. Baier observed Plaintiff walking normally, loading a 50-pound bag of concrete mix into his vehicle, painting the ceiling of his residence for an extended period of time, riding a bike, bending down at the waist, and running after a dog.
Dr. Miller initially testified at his deposition that without surgery, he would put Plaintiff on light-duty work and assign him a five percent impairment rating. With surgery, he would put Plaintiff on medium-duty work and assign a ten percent impairment rating. However, Dr. Miller testified further that
after reading those three different [surveillance] reports, and based on the pictures, as well as the written documentation, when you put it all together, my sense is that [Plaintiff], in my opinion, does not seem to be in the amount of pain that he indicated to me before, and when I saw him in the office. And I would actually rescind my suggestion of performing surgery on him.
Dr. Miller also changed Plaintiff's impairment rating to zero.
Dr. Noreen Denny, a psychologist at Pitt County Memorial Hospital, conducted a neuropsychological evaluation of Plaintiff on 6 September and 26 September 2006 to determine whether there was any evidence of brain injury. Dr. Denny reviewed Plaintiff's medical records and school transcripts, interviewed Plaintiff and his wife, and performed 29 standardized tests. Dr. Denny noted that Plaintiff had completed high school in a special education program with a 1.1 grade point average. She concluded that Plaintiff's cognitive functioning prior to his fall on 9 December 2004 was low. Dr. Denny's evaluation noted that Plaintiff failed all aspects of symptom validity testing, indicating that he was intentionally scoring low on the tests. Plaintiff's performance was lower than the performance of a person with severe traumatic brain injury or an elderly individual hospitalized with advanced dementia. On some of the tests, Plaintiff scored below chance, indicating that he could have done better by guessing. Dr. Denny testified that Plaintiff's "overall profile of scores with almost global impairment and functioning is not consistent with the severity of injury as reported in his available medical records." It was Dr. Denny's opinion that Plaintiff was not putting forth his best effort.
At the request of Plaintiff's counsel, Dr. Kushner saw Plaintiff again on 21 August 2006. Plaintiff complained of a "dull daily headache" and "back pain[.]" The results of Dr. Kushner's neurologic examination of Plaintiff were normal. Based upon Plaintiff's reports of pain, as well as a "disability evaluation from a psychologist who cites significant depression[,]" Dr. Kushner's noted that "[t]his all sounds like traumatic brain injury syndrome." Dr. Kushner believed that some of Plaintiff's problems may be permanent.
At his deposition, Dr. Kushner acknowledged that the results of Plaintiff's CT scan, EEG, and MRI were all normal. Furthermore, Dr. Kushner admitted that he had no knowledge of Plaintiff's cognitive functioning prior to the December 2004 accident, was unaware of Plaintiff's work history, did not find any documentation supporting Plaintiff's claim that he had been unconscious for half an hour following his 9 December 2004 fall, and did not know that after being released from the hospital after the fall, Plaintiff had returned to work at Strober, and had subsequently worked at Greenleaf and Newcon.

III. Discussion
Our review of an Opinion and Award of the Industrial Commission is limited to a determination of whether (i) there was any competent evidence before the Commission to support its findings of fact and (ii) whether those findings of fact support the Commission's conclusions of law. Faison v. Allen Canning Co., 163 N.C. App. 755, 757, 594 S.E.2d 446, 448 (2004). If supported by competent evidence, the Commission's findings are conclusive on appeal even if the evidence might also support contrary findings. Jones v. Candler Mobile Vill., 118 N.C. App. 719, 721, 457 S.E.2d 315, 317 (1995). The Commission's conclusions of law are reviewed de novo. Grantham v. R. G. Barry Corp., 127 N.C. App. 529, 534, 491 S.E.2d 678, 681 (1997), disc. review denied, 347 N.C. 671, 500 S.E.2d 86 (1998).
"[T]he [F]ull Commission is the sole judge of the weight and credibility of the evidence . . . ." Deese v. Champion Int'l Corp., 352 N.C. 109, 116, 530 S.E.2d 549, 553 (2000). Thus, on appeal, this Court "does not have the right to weigh the evidence and decide the issue on the basis of its weight." Adams v. AVX Corp., 349 N.C. 676, 681, 509 S.E.2d 411, 414 (1998) (quotation marks and citation omitted), reh'g denied, 350 N.C. 108, 532 S.E.2d 522 (1999).

A. Admissibility of Surveillance Reports
By Plaintiff's first and second arguments, Plaintiff contends that the surveillance reports prepared by Mr. Baier do not fairly and accurately reflect the videos they purportedly summarized and, thus, are not admissible. We disagree.
"[E]very writing sought to be admitted must be properly authenticated . . . ." FCX, Inc. v. Caudill, 85 N.C. App. 272, 276, 354 S.E.2d 767, 771 (1987). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C. Gen. Stat. § 8C-1, Rule 901(a) (2007). Testimony of a witness with knowledge that the matter is what it is claimed to be is sufficient to conform with the requirements of Rule 901. N.C. Gen. Stat. § 8C-1, Rule 901(b)(1) (2007). "Authentication does not, however, require strict, mathematical accuracy, and a lack of accuracy will generally go to the weight and not the admissibility of the exhibit." Horne v. Vassey, 157 N.C. App. 681, 686, 579 S.E.2d 924, 927 (2003) (quotation marks and citation omitted).
At the hearing, Mr. Baier testified that he had personally conducted surveillance of Plaintiff; that as a result of conducting that surveillance, Mr. Baier prepared the three reports at issue; and that the reports provided an accurate reflection of the things that he observed while watching Plaintiff. Such testimony is sufficient to conform with the authentication requirements of Rule 901.
Furthermore, the Full Commission found as fact:
44. Submitted into evidence at the hearing was [sic] [D]efendants' Exhibits 1 through 3 representing surveillance reports dated February 11, 2006, March 16, 2006 and November 20, 2006. Additionally, surveillance video documentation was entered into evidence as Defendants' Exhibit 4 and 5. Marty Baer [sic], a private investigator, procured the surveillance video and issued the corresponding reports. Mr. [Baier] testified at the hearing regarding his surveillance of [P]laintiff. Defendants' Exhibits 1 through 5 are found to accurately represent the claimant's activities during the time Mr. [Baier] observed him and therefore, the surveillance exhibits are deemed to be credible evidence.
Plaintiff contends that certain inferences that could be drawn from the reports were not fair or accurate. However, at the hearing, Plaintiff was offered ample opportunity to impeach the credibility of Mr. Baier and to rebut any potentially damaging inferences that could have been drawn from the reports. Indeed, Plaintiff extensively cross-examined Mr. Baier about his reports. As Plaintiff's argument goes to the weight and credibility of the evidence, and not the admissibility of the evidence, and the Full Commission, as the ultimate finder of fact, determines the credibility of witnesses and the inferences to be drawn from the evidence, Adams, 349 N.C. at 681, 509 S.E.2d at 414, Plaintiff's argument to this Court is misplaced.
Plaintiff further argues that the reports should not have been admitted as substantive evidence because they were the basis for Dr. Miller's expert opinion.
Facts or data not otherwise admissible in evidence are admissible for the limited purpose of showing the basis for the expert's opinion, and not as substantive evidence, State v. Jones, 322 N.C. 406, 414, 368 S.E.2d 844, 848 (1988), if they are the type "reasonably relied upon by experts in the particular field in forming opinions or inferences[.]" N.C. Gen. Stat. § 8C-1, Rule 703 (2007).
In this case, Mr. Baier testified at the hearing that he personally conducted the surveillance of Plaintiff and personally prepared the reports. The reports were then entered into evidence through Mr. Baier. At his deposition following the hearing, Dr. Miller reviewed the reports and accompanying photographs. Dr. Miller testified that if the Commission found the author of the reports, Mr. Baier, to be credible, then Dr. Miller's opinion was that Plaintiff would be able to return to his normal work duties without an impairment rating. On the other hand, if the Commission found Mr. Baier not to be credible, then Dr. Miller's opinion would be that Plaintiff would have a five percent impairment rating without surgery and a ten percent impairment rating with surgery. Accordingly, although the reports were not admissible as substantive evidence if used solely as the basis of Dr. Miller's opinion, the reports were properly admitted as substantive evidence through Mr. Baier. N.C. Gen. Stat. § 8C-1, Rule 803(6) (2007). The mere fact that the reports were admitted as substantive evidence through their author's authentication does not mean that they cannot subsequently be used as the basis for an expert's opinion testimony. Plaintiff's argument lacks merit and is overruled.
Finally, Plaintiff argues that "[t]he Full Commission's refusal to consider a skewed and incomplete video record used to attempt to distort the view of a doctor" in Terry v. PPG Indus. Inc., 156 N.C. App. 512, 577 S.E.2d 326, disc. review denied, 357 N.C. 256, 583 S.E.2d 290 (2003), supports his position that the Commission erred in admitting the reports into evidence. In Terry, this Court explained:
"Before making findings of fact, the Industrial Commission must consider all of the evidence. The Industrial Commission may not discount or disregard any evidence, but may choose not to believe the evidence after considering it."
Id. at 522, 577 S.E.2d at 333 (quoting Weaver v. Am. Nat'l Can Corp., 123 N.C. App. 507, 510, 473 S.E.2d 10, 12 (1996)). The evidence in Terry demonstrated that an agent of the defendant presented a video of plaintiff to plaintiff's doctor, outside of plaintiff's presence, in an attempt to distort the doctor's view of plaintiff's truthfulness regarding her physical disability. The Full Commission considered the tape but, finding it to be "skewed and incomplete[,]" chose not to believe it. Id. at 522, 577 S.E.2d at 334. Thus, contrary to Plaintiff's argument, the Commission did not exclude the video tape from evidence but, instead, after considering it, chose to reject it because it lacked credibility.
Here, the Commission considered the properly admitted surveillance evidence and chose to believe it instead of Plaintiff's testimony. That decision is entirely the prerogative of the Commission. Deese, 352 N.C. at 116, 530 S.E.2d at 553.
Accordingly, for the reasons stated above, the Full Commission did not err in admitting the surveillance reports into evidence. The assignments of error upon which Plaintiff's arguments are based are overruled.

B. Competency of Expert Evidence
By Plaintiff's third argument, Plaintiff contends that the testimony of Dr. Denny was not competent evidence to refute Plaintiff's evidence that he had not made a full recovery from the brain injury sustained on 9 December 2004.
An employee injured in the course of his employment is disabled under the Act if the injury results in an "incapacity . . . to earn the wages which the employee was receiving at the time of injury in the same or any other employment." N.C. Gen. Stat. § 97-2(9) (2007). "Accordingly, disability as defined in the Act is the impairment of the injured employee's earning capacity rather than physical disablement." Russell v. Lowe's Prod. Distrib., 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
The burden is on the employee to show
(1) that [he] was incapable after his injury of earning the same wages he had earned before his injury in the same employment, (2) that [he] was incapable after his injury of earning the same wages he had earned before his injury in any other employment, and (3) that [his] incapacity to earn was caused by [his] injury.
Hilliard v. Apex Cabinet Co., 305 N.C. 593, 595, 290 S.E.2d 682, 683 (1982). The employee may meet this burden in one of the following ways:
(1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury.
Russell, 108 N.C. App. at 765, 425 S.E.2d at 457 (internal citations omitted).
The Commission made the following findings of fact regarding Plaintiff's brain injury:
7. Plaintiff sustained an admittedly compensable injury on December 9, 2004 when he fell from the second floor landing on the first floor. . . . [P]laintiff was diagnosed with several injuries, including a closed head injury and back strain. . . . As a result of this injury, [P]laintiff . . . had a mild head injury. . . . The CT scan of his head immediately following the accident did not show any acute intracranial abnormalities. . . .
8. Plaintiff was taken out of work due to his injuries from December 9, 2004 through January 10, 2005.
. . . .
45. There is no credible evidence that [P]laintiff is under any work restrictions or medically restricted from working in any capacity for either a head injury [or] back injuries.
. . . .
49. The Full Commission finds that the head injury of December 9, 2004 has not changed the manner in which [P]laintiff engages in his household activities.
50. Mr. Tom Swann testified on behalf of [D]efendant [Newcon]. . . . Mr. Swann was responsible for hiring [P]laintiff.
. . . .
53. . . . Mr. Swann saw no change in [P]laintiff's mental abilities after the December 9, 2004 accident as compared to before.
54. Dr. Noreen Denny, a neuropsychologist, evaluated [P]laintiff on September 6 and September 26, [] 2006. Dr. Denny was asked to perform a neuropsychological evaluation which is an evaluation to assess a person's cognitive functioning, to find out what their areas of strengths and weaknesses are and to try to determine whether there was any departure from prior functioning as an indication for brain injury.
55. Dr. Denny's summary of test results was that she considered [P]laintiff's neuropsychological evaluation invalid. Plaintiff failed on one test of symptom validity, which was typically performed well by individuals even with severe traumatic brain injury. Plaintiff failed on various aspects of another symptom validity test where he performed below individuals with even severe traumatic brain injury on items which were typically very easy, even for those individuals. Plaintiff's performance was below those seen for elderly individuals hospitalized for advanced dementia. Plaintiff displayed improbable patterns of performance, where scores were much higher on more difficult aspects of the test while scores were extremely low on very easy aspects. Furthermore, on some aspects of each test, [P]laintiff scored below chance, where he would have done better by guessing alone.
56. Plaintiff's overall profile of scores was almost global impairment and functioning that was not consistent with the severity of injury as reported in his available medical records.
57. Dr. Denny was asked whether she could state to a reasonable degree of psychological certainty whether the head injury of December 9, 2004 caused a decrease or worsening of [P]laintiff's pre-morbid level of functioning. Dr. Denny responded that typically when people suffer a mild traumatic brain injury they fully recover and that [P]laintiff should have recovered from a brain injury perspective over the course of three months and not have any lasting deficits related to it. Unfortunately, because [P]laintiff did not put forth a full effort, she was unable to opine whether [P]laintiff was capable from a cognitive perspective to perform simple routine tasks or perform in a competitive work environment.
59.[2] Dr. Denny was of the opinion that there was a good chance that [P]laintiff was malingering during his evaluation.
60. Dr. Michael Kushner was deposed on May 24, 2007. Dr. Kushner testified that he is a board-certified neurologist having experience and training with traumatic brain injuries. Dr. Kushner testified that he treated [P]laintiff after he sustained a fall on December 9, 2004. He believed [P]laintiff had a syndrome of problems resulting from the head injury that could be classified as traumatic brain injury syndrome or post-concussion syndrome.
61. Dr. Kushner testified to a reasonable degree of medical certainty that [P]laintiff's head injury of December 9, 2004 caused an intellectual decline, loss of vigor, lack of coordination, pain and a decline in his ability to move around. He then testified that [P]laintiff's head injury of December 9, 2004 resulted in cognitive or intellectual loss and chronic pain that interfere with his ability to maintain a schedule, show up for work and do a job.
62. Without having the benefit of any cognitive testing, Dr. Kushner opined that [P]laintiff suffered cognitive or intellectual loss after the injury, which caused him to be unable to maintain a schedule, show up for work or do the job.
63. Given Dr. Kushner's failure to consider all of the evidence, Dr. Kushner's opinion is given less weight than the opinions of Dr. Denny, the neuropsychologist, and Dr. Miller, the orthopaedic surgeon.
Plaintiff contends that, based on the opinions of Dr. Kushner and Dr. Daniel E. Everhart, he met his burden of proving his claim of disability by method one of the Russell test.
Plaintiff argues that
[b]ased on his review of all pertinent medical information, [] Dr. Kushner testified, to a reasonable degree of medical certainty, that because of a moderate to severe concussion from the fall[,] Plaintiff "suffered cognitive or intellectual loss after the injury, along with chronic pain, that based upon these data, interfere with his ability to maintain a schedule, show up for work, do the job. So it sounds like he's basically unemployable."
We are unpersuaded by Plaintiff's argument.
At his deposition, Dr. Kushner was asked how he was able to state that Plaintiff had experienced a significant decrease in his cognitive functioning after the accident. Dr. Kushner replied, "I'm basing it on what [Plaintiff is] telling me, and other observers, like the wife." However, when asked if he was aware of Plaintiff's level of cognitive functioning prior to the December 2004 accident, Dr. Kushner replied, "No. No."
Dr. Kushner testified that whether Plaintiff's current inability to "handle money or keep his schedule up and keep on task" was a cognitive impairment resulting from the 9 December 2004 injury would "depend[] on what he was able to do or was not able to do" before the injury. However, when Dr. Kushner was asked,
if [Plaintiff] was never able to do those things prior to [the injury]  I mean, his entire life he was never able to handle money, drive a car, hold down a regular job, or anything of that nature, and then he wasn't able to do those same things afterwards, is it your opinion, still, that he has had a significant worsening of his cognitive abilities,
Dr. Kushner replied, "I don't understand the question." Furthermore, when asked what objective evidence Dr. Kushner had to prove that Plaintiff experienced a significant cognitive worsening after the 9 December 2004 incident, Dr. Kushner replied, "I don't  I don't have to prove it. I have to give you my honest medical opinion, which is based  which is based  based upon the data and impressions I have available to me."
Although Dr. Kushner cited an Employee Review which stated that Plaintiff "has a good personality, works diligently, good attendance record, no absences. He's not progressed as well as . . . expected" as evidence of Plaintiff's pre-injury level of functioning, that report was dated 25 August 2005, after the fall in December of 2004. When asked if that report actually supported the fact that Plaintiff continued to be able to do his job after the head injury, Dr. Kushner responded, "If you say  if you say so. I can't answer that question. All I can do is give you my  my impression of, you know, almost twenty-five years of dealing with head injury and neurological problems . . . ." Dr. Kushner testified that it was his understanding that Plaintiff had never returned to work after the 9 December 2004 injury.
On or around 20 April 2005, Plaintiff had been seen by Dr. Kushner. Dr. Kushner noted on that date that "[i]f there is not a substantial resolution by July or August then cognitive testing or formal neuropsychological testing could be worthwhile." At his deposition, Dr. Kushner agreed that a neuropsychological evaluation is sometimes used to evaluate people with traumatic brain injury. However, Dr. Kushner did not think the results of the tests done by Dr. Denny "illuminated this case any further" for him, other than to indicate that Plaintiff "was a hard guy to test."
The evidence of record shows the following: Dr. Kushner's opinion did not take into consideration any cognitive testing of Plaintiff. Furthermore, Dr. Kushner had no knowledge of Plaintiff's cognitive functioning prior to the December 2004 accident, was unaware of Plaintiff's work history, did not find any documentation supporting Plaintiff's claim that he had been unconscious for half an hour following his 9 December 2004 fall, and did not know that after being released from the hospital after the fall, Plaintiff had returned to work at Strober, and had subsequently worked at Greenleaf and Newcon. Accordingly, the Full Commission's finding that Dr. Kushner "fail[ed] to consider all of the evidence" is supported by competent record evidence. "Given Dr. Kushner's failure to consider all of the evidence," the Commission found that "Dr. Kushner's opinion is given less weight than the opinion[] of Dr. Denny . . . ." As this Court "does not have the right to weigh the evidence and decide the issue on the basis of its weight[,]" Adams, 349 N.C. at 681, 509 S.E.2d at 414 (quotation marks and citation omitted), the Commission's decision to give more weight to Dr. Denny's opinion than Dr. Kushner's opinion is not a matter reviewable by us on appeal.
Furthermore, the Commission is not bound by expert opinion testimony, even where it is undisputed. See Rogers v. Smoky Mountain Petroleum Co., 172 N.C. App. 521, 529, 617 S.E.2d 292, 298 (2005) ("The Industrial Commission is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, and may reject a witness'[s] testimony entirely if warranted by disbelief of that witness." (quotation marks and citation omitted)). Therefore, even if there had been no evidence contradicting Dr. Kushner's testimony, the Commission still would have been free to reject this testimony. See id. at 529, 617 S.E.2d at 297 ("Before making findings of fact, the Industrial Commission must consider all of the evidence. The Industrial Commission may not discount or disregard any evidence, but may choose not to believe the evidence after considering it." (quotation marks and citation omitted)).
Additionally, Plaintiff claims that "Dr. Everhart agrees with Dr. Kushner that Plaintiff is unable to return to regular fulltime [sic] employment." Plaintiff cites the following statement from Dr. Everhart's evaluation report to support this contention: "This patient may be able to perform some functions on a job; however, I doubt he could tolerate the stress and pressures associated with full-time work activity." However, Plaintiff's argument fails to account for the very next sentence from the report: "Again, however, this is qualified by the fact that I am uncertain to what extent the patient was motivated for testing on this date." In the context of the entire report, Dr. Everhart's statements corroborate Dr. Denny's opinion, as found by the Commission, "that there was a good chance that [P]laintiff was malingering during his evaluation" and do not sufficiently support Plaintiff's claim of disability. We reiterate that while the Commission must consider all of the evidence before making findings of fact, the Commission may choose not to believe all or a part of any witness's testimony after considering it. Rogers, 172 N.C. App. at 529, 617 S.E.2d at 297.
Plaintiff next argues that the findings of fact that Dr. Denny expressed no opinion as to "whether the head injury of December 9, 2004, caused a decrease or worsening of [P]laintiff's pre-morbid level of functioning" and that Dr. Denny "was unable to opine whether [P]laintiff was capable from a cognitive perspective to perform simple routine tasks or perform in a competitive work environment" are based on conjecture and, thus, are not sufficient to show that Plaintiff had recovered from his brain injury. Based on our review of Dr. Denny's testimony, we disagree.
Nonetheless, as it is Plaintiff's burden to prove that he is disabled as a result of his head injury, and not Defendants' burden to prove that Plaintiff has recovered from his brain injury, Plaintiff's argument is without merit.
Plaintiff further argues that "Dr. Denny's opinion that Plaintiff sustained only a mild brain injury is equivocal" and, thus, is not competent to refute Plaintiff's assertion that he sustained a severe traumatic brain injury. Plaintiff insinuates that Dr. Denny equivocated between whether Plaintiff sustained a severe or a mild traumatic brain injury. This contention misses the mark.
Dr. Denny testified, "My impression was that . . . he may have suffered a concussion or a mild traumatic brain injury[.]" She also testified that "[a]vailable records suggest that he may have sustained a mild traumatic injury[.]" Dr. Denny's unequivocal testimony was that, at most, Plaintiff sustained a mild traumatic brain injury.
Finally, Plaintiff argues that Dr. Denny's testimony that a person with a mild traumatic brain injury typically recovers without deficits within three months was not competent medical evidence. However, Plaintiff again misapprehends the significance of having the burden of proof to show disability. It was Plaintiff's burden to show
(1) that [he] was incapable after his injury of earning the same wages he had earned before his injury in the same employment, (2) that [he] was incapable after his injury of earning the same wages he had earned before his injury in any other employment, and (3) that [his] incapacity to earn was caused by [his] injury.
Hilliard, 305 N.C. at 595, 290 S.E.2d at 683. It was not Defendants' burden to prove that Plaintiff was not disabled, but, rather, Plaintiff's burden to prove disability. As explained above, the Commission exercised its right and responsibility to determine the credibility of the evidence before it and found Plaintiff's evidence lacking in credibility. Again, this Court does not re-weigh that determination. Adams, 349 N.C. at 681, 509 S.E.2d at 414.
Accordingly, as Plaintiff failed to offer sufficient evidence of disability, the assignments of error upon which Plaintiff's arguments are based are overruled.
AFFIRMED.
Judges BRYANT and CALABRIA concur.
Report per Rule 30(e).
NOTES
[1] Defendant also alleged, and the Commission addressed, a second injury sustained during Plaintiff's employment with Strober. However, this claim is not documented in the record and will not be addressed in this opinion.
[2] The Order and Award does not contain a finding of fact number 58.